## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MR. F. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:20-cv-00220-NT |
| | ) | |
| MSAD #35, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PLAINTIFFS' IDEA APPEAL

Plaintiffs Mr. F. ("**Father**") and Ms. H. ("**Mother**") (collectively, the "**Parents**") are the parents of A.F., a school-age child with a disability. The Defendant is Maine School Administrative District #35 (the "**District**"), which was the local educational agency responsible for making a free appropriate public education ("**FAPE**") available to A.F. under the Individuals with Disabilities Education Act (the "**IDEA**"), 20 U.S.C. §§ 1400–1482.

The Parents challenge the decision reached by a Maine Department of Education due process hearing officer ("**DPHO**"), which ruled that the District did not violate the IDEA's child find obligation. *See* 20 U.S.C. § 1412(a)(3)(A). For the reasons that follow, the Court **DENIES** the Parents' request for relief.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The IDEA

The IDEA requires states to "identif[y], locate[ ], and evaluate[ ]" all "children with disabilities" residing in the state, 20 U.S.C. § 1412(a)(3)(A), and in Maine, that

responsibility lies with school districts, 20-A M.R.S. § 7202(1). This statutory requirement is known as the IDEA's "child find" requirement. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). A "child with a disability" is defined as a child with an impairment "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A). A child who has a disability but who does not need special education is not a "child with a disability" under the IDEA. *Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 73 n.1 (1st Cir. 2016); 34 C.F.R. § 300.8(a)(2).

A state's child find obligation extends to "[c]hildren who are suspected of being a child with a disability . . . and in need of special education." 34 C.F.R. § 300.111(c)(1). But school districts need not "conduct a formal evaluation of every struggling student," *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012); *accord W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 144 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 934 (2020), or jump to the conclusion that any abnormalities in behavior denote a disability, *D.K.*, 696 F.3d at 251.

A school district's child find obligation is triggered when the district has reason to suspect three things: (1) that a child has a qualifying disability, (2) that the child needs special education and related services, and (3) that that need for special education is due to the disability.[1] *Doe v. Cape Elizabeth Sch. Dep't*, 382 F. Supp. 3d

---

[1]     The Plaintiffs argue that the child find obligation is a two-part test and that a school district's obligation is triggered when it (1) has reason to suspect a disability and (2) has reason to suspect that special education may be needed to address that disability. Pls.' Mem. of Law 18 (ECF No. 17) (citing *El Paso Ind. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 950 (W. D. Tex. 2008)). This mostly just collapses the three-part test into two pieces. But this description of the test also ignores the fact that the Individuals with Disabilities Education Act ("**IDEA**") requires the existence of a *qualifying* disability—that is, one of the disabilities as outlined in and defined by the IDEA and its regulations.

83, 99 (D. Me. 2019) (internal quotation marks omitted); *see Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1, 5, 14 (1st Cir. 2007). A school district violates its child find obligation when "school officials overlook[ ] clear signs of disability and [are] negligent in failing to order testing, or [when] there [is] no rational justification for" the school's failure to evaluate the child. *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (internal quotation marks omitted); *accord Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018); *see Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016) ("[A] disability is 'suspected,' and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability."). For example, "the informed suspicions" of a child's parents might trigger a school district's child find obligation, even where the school district questions these suspicions. *See Timothy O.*, 822 F.3d at 1120–21.

In assessing whether a district's child find obligation is triggered, the first question is whether the district had reason to suspect that the child has a qualifying disability. Qualifying disabilities are designated by federal law and include emotional disturbance ("**ED**"), autism, other health impairment ("**OHI**"), and multiple disabilities. 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8. Federal and state regulations set the criteria for what constitutes each qualifying disability, *see* 34 C.F.R. § 300.8(c); 05-071 C.M.R. ch. 101, Me. Unified Special Educ. Reg. Birth to Age Twenty

---

*See* 20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.8. That means that not just any disability—and not just any definition of the listed disabilities—is enough to trigger the protections of the IDEA.

("**MUSER**"), § VII(2) (2017), each of which, as relevant here, requires that the impairment "adversely affect[ ]" the "educational performance" of the child, *see Mr. I.*, 480 F.3d at 11.

Maine defines "adverse effect" as "a negative impact that is more than a minor or transient hindrance, evidenced by findings and observations based on data sources and objective assessments with replicable results." MUSER § II(3). While this adverse effect cannot be minor or transient, *see id.*, it need not be substantial or significant, *Mr. I.*, 480 F.3d at 13.[2] Normal, age-appropriate behavior is not considered to be an "adverse effect." MUSER § II(3) ("An adverse effect on educational performance does not include a developmentally appropriate characteristic of age/grade peers in the general population.").

As for what comprises a child's "educational performance," Maine defines this term to encompass "performance in those academic and functional areas . . . assessed through the local [school district's] own curriculum," which includes "how the child demonstrates his/her skills and behaviors in cognition, communication, motor, adaptive, social/emotional and sensory areas." *Id.* § II(10), (15). Qualifying children are entitled "to services that target *all* of their special needs," not just academic ones, to include, for example, social and emotional skills and behaviors. *Mr. I.*, 480 F.3d at 12 (internal quotation marks omitted).

---

[2]      In *Mr. I.*, the First Circuit analyzed an earlier version of the Maine Department of Education regulations. *See generally Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1 (1st Cir. 2007). And, at that time, the regulations did not define "adverse effect." *Mr. I. v. Me. Sch. Admin. Dist. 55*, 416 F. Supp. 2d 147, 160 (D. Me. 2006), *aff'd, Mr. I.*, 480 F.3d 1. Given the low bar that Maine has set for what constitutes an adverse effect, I consider *Mr. I.*'s analysis to still be good law.

4

A child with a disability is eligible for an individualized education program ("**IEP**"). *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017). And while an IEP need not address problems that are truly distinct from learning problems, because Maine defines "educational performance" to include more than just academics, a child may be eligible for special education due to deficits in non-academic areas. *Mr. I.*, 480 F.3d at 12.[3]

The second part of the child find obligation asks whether the district has reason to suspect that the child with a qualifying disability needs special education and related services. Maine considers a child to " 'need[ ]' special education and related services when, because of the disability, the child can neither progress effectively in a regular education program nor receive reasonable benefit from such a program in spite of other services available to the child." MUSER § VII(2). "If the child find process indicates that a child *may* require special education . . . to benefit from regular education," a referral to determine eligibility is required. *Id.* § IV(2)(D) (emphasis added).

Finally, the third requirement of the child find obligation is satisfied if the district has reason to suspect that the qualifying disability is the cause of the child's need for special education and related services. Once a school district has "identif[ied]" a student through the child find process—that is, once it has reason to

---

[3]    Since *Mr. I.*, Maine has narrowed its definition of "educational performance." *Compare* 05-071 C.M.R. ch. 101, Me. Unified Special Educ. Reg. Birth to Age Twenty ("**MUSER**"), § II(10) (2017), *with Mr. I.*, 480 F.3d at 11 (citing MUSER § 2.7 (2006)). However, the point remains that Maine continues to define "educational performance" to include more than academics.

suspect that the child might require special education due to his/her disability—the district must refer the child for a special education evaluation within a reasonable time. *W.A.*, 927 F.3d at 133; *D.K.*, 696 F.3d at 250.[4]

Parental consent is generally required before a school district may initiate an evaluation.[5] *See* 34 C.F.R. § 300.300(a); MUSER § V(1)(A)(4)(a)(i). And the district "must make reasonable efforts to obtain" a parent's "informed consent." 34 C.F.R. § 300.300(a)(1)(iii); MUSER § V(1)(A)(4)(a)(i); *see* Me. Dep't of Educ. Admin. Letter No. 85 (June 12, 2012), *available at* https://mainedoenews.net/2012/06/12/clarification-of-saus-obligation-to-refer-students-to-special-education/ ("[W]hile parents ultimately have the authority to withhold consent for evaluation, the [school district] is nevertheless required to convene a meeting at which the student's current performance and need for further evaluation can be discussed, so that the parents' decision is an informed one."). That is, the parents must be "fully informed of all information relevant to the activity for which consent is sought." 34 C.F.R. § 300.9(a); MUSER § II(6)(A).

The school district must also provide the child's parents with written notice of any district "propos[al]" or "refus[al] to initiate or change[ ] the identification [or] evaluation of the child," and this notice must include the district's reason for its intent

---

[4]      School district staff and parents may also refer a child for evaluation regardless of the results of the child find process. 20 U.S.C. § 1414(a)(1)(B); MUSER § IV(2)(E)(2).

[5]      If a parent does not consent to an evaluation, a school district may, but is not required to, seek a due process hearing to authorize the district to pursue an evaluation in spite of the parent's refusal to consent. 20 U.S.C. § 1414(a)(1)(D)(ii)(I); MUSER § V(4)(b)(i). Because this provision of the IDEA is not at issue here, I ignore this statutory pathway for a school district to override parental refusal to consent.

or refusal to act. 20 U.S.C. § 1415(b)(3), (c)(1); *accord* 34 C.F.R. § 300.503(a), (b). After parental consent is received, the school district has forty-five school days to not only complete the evaluation, but also to "proceed to determine if the child is a child with a disability." MUSER § V(1)(A)(3)(a).

A violation of the child find obligation is a procedural violation, *Mr. P*, 885 F.3d at 750; *D.K.*, 696 F.3d at 249, and thus cannot always give rise to a cause of action. Rather, a violation of the child find obligation is only cognizable if it impedes a child's right to a FAPE, results in a significant impediment to the parents' opportunity to participate in the IDEA decision-making process, or causes a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *see Pollack v. Reg'l Sch. Unit 75*, 886 F.3d 75, 80, 87 (1st Cir. 2018).

In evaluating whether the child find obligation has been violated, and whether that procedural violation has substantive consequences, I must evaluate the reasonableness of the delay between the date the child find obligation was triggered due to notice of a likely disability and the date that obligation was satisfied. *Spring Branch Indep. Sch. Dist. v. O.W.*, 961 F.3d 781, 793 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1389 (2021). "A delay is reasonable when, throughout the period between notice and referral, a district takes proactive steps to comply with its child find duty to identify, locate, and evaluate students with disabilities." *Id.*

## II.   Section 504 of the Rehabilitation Act

Like the IDEA, Section 504 of the Rehabilitation Act ("**Section 504**")[6] applies to schools, *see* 29 U.S.C. § 794(b)(2)(B), although the statutes differ in their goals. The IDEA is concerned with ensuring that disabled children receive a FAPE, including any necessary special education. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748, 753, 756 (2017). Section 504, on the other hand, is focused on enabling disabled individuals "to participate equally to all others in public" places and programs, which includes the provision of reasonable accommodations for a child at school. *Id.* at 756.

"Any child who is entitled to an IEP under the IDEA is also protected by [S]ection 504, but the inverse is not true." *Doucette v. Georgetown Pub. Sch.*, 936 F.3d 16, 24 n.12 (1st Cir. 2019). When a student does not qualify for an IEP, a school district may still offer the student some accommodations under Section 504 (a "**504 plan**"). *Ms. S. v. Reg'l Sch. Unit 72*, 829 F.3d 95, 100 n.1 (1st Cir. 2016). However, a 504 plan is more limited in scope than an IEP. *See Reg'l Sch. Unit 51 v. Doe*, 920 F. Supp. 2d 168, 204 (D. Me. (2013) ("[A] section 504 plan typically is not an adequate substitute for an IEP."); *cf. Doucette*, 936 F.3d at 28 (noting that an IEP typically "include[s] all supports and services that the child needs," including those required by Section 504).

Despite the different purposes of the statutes, Section 504 is similar to the IDEA in many respects. As relevant here, it contains a similar child find requirement

---

[6]   Section 504 of the Rehabilitation Act ("**Section 504**") provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

to the IDEA. *M.G. v. Williamson Cnty. Sch.*, 720 F. App'x 280, 284 n.4 (6th Cir. 2018) (citing 34 C.F.R. § 104.35(a)). This includes a similar preliminary evaluation process. *See* 34 C.F.R. § 104.35(a); *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 303 n.1 (5th Cir. 2020). Specifically, Section 504 requires schools to conduct an evaluation, according to specific procedures, of any child who, because of his/her disability, "needs or is believed to need special education or related services." 34 C.F.R. § 104.35(a), (b). Disabled students are also subject to periodic reevaluation, which occurs according to the same procedures as an initial evaluation. *Id.* § 104.35(d).

While a 504 plan is not a substitute for an IEP, it is sometimes reasonable and permissible for a school to pursue a 504 plan prior to making a special education referral. *Cape Elizabeth Sch. Dep't*, 382 F. Supp. 3d at 102. But a 504 plan is not a substitute for an evaluation once the "school district is 'on notice of acts or behavior likely to indicate a disability.' " *Spring Branch*, 961 F.3d at 794 (quoting *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018)). And even where a 504 plan is reasonable, it is not necessarily reasonable to make that plan a preliminary rather than concurrent step to pursuing an evaluation. *Id.* at 794 n.12; *see* U.S. Dep't of Educ., Office for Civil Rights, Students with ADHD and Section 504: A Resource Guide (July 2016) 16, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201607-504-adhd.pdf ("Implementing an intervention strategy and evaluating for a disability do not have to occur sequentially, but could be implemented at the same time, as parallel responses in an attempt to identify and address a student's needs. Interventions could be implemented while a student is

being evaluated, and information gathered during the intervention protocol could be useful in the evaluation process.").

## PROCEDURAL HISTORY

On October 23, 2019, the Parents filed a due process complaint and hearing request (the "**Due Process Hearing Complaint**") with the Maine Department of Education claiming that the District had belatedly identified A.F. as a student with a disability and had failed to provide him with an appropriate IEP. R. at 1–12. The complaint outlined many of the events I recount below and sought "compensatory education and related services for [A.F.] for the previous two years and reimbursement for [various] out of pocket expenses . . . incurred since fall 2017." R. at 12.

The DPHO conducted a seven-day hearing in January of 2020, during which she heard the testimony of twelve witnesses. R. at 17. The DPHO denied relief, finding that the District's delay in identifying A.F. as a student with a disability did not violate its child find obligation and finding that the IEP that was crafted at the beginning of A.F.'s ninth-grade year was adequate. R. at 93.

The Parents subsequently appealed to this Court the portion of the DPHO's decision pertaining to the District's child find obligation, and they were allowed to supplement the record with post-hearing evidence relating to an IEP created by A.F.'s new school district in New Hampshire (the "**Dover District**"). Order on Mot. to Permit Additional Evid. (ECF No. 16).

## STANDARD OF REVIEW

A parent (or school district) displeased with the decision of a DPHO can seek review in federal court. 20 U.S.C. § 1415(i)(2)(A). The district court is to conduct "involved oversight" of the DPHO's decision, "a more critical appraisal than clear-error review" but something "well short of complete *de novo* review." *Cape Elizabeth Sch. Dist.*, 832 F.3d at 82 (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993)). The district court is charged with reviewing the administrative record (and any supplements to it) and making "an independent ruling based on the preponderance of the evidence." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35–36 (1st Cir. 2012) (quoting *Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004)); 20 U.S.C. § 1415(i)(2)(C). "However, 'that independence is tempered by the requirement that the court give due weight to the hearing officer's findings.' " *D.B.*, 675 F.3d at 36 (quoting *Lt. T.B.*, 361 F.3d at 83); *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 85 (1st Cir. 2012) ("[I]n an IDEA case, a district court essentially conducts a bench trial based on a stipulated record, but must nevertheless give due deference to the findings of the administrative hearing officer." (internal quotation marks and citations omitted)). "Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn*, 998 F.2d at 1087 (internal citation omitted). "[T]he district court should afford varying degrees of deference to the [DPHO] depending on the persuasiveness of the administrative finding" while making "an independent judgment on the relevance (or credibility) of the measures in dispute." *Cape Elizabeth*

*Sch. Dist.*, 832 F.3d at 83 (internal citations omitted). At bottom, "the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." *Id.* at 84 (quoting *Lenn*, 998 F.2d at 1087).

## FACTUAL BACKGROUND

Because the Due Process Hearing Complaint was filed on October 23, 2019, any statutory violation can only have occurred on or after October 23, 2017, (early in A.F.'s seventh-grade year) due to the IDEA's two-year statute of limitations. *See* 20 U.S.C. § 1415(b)(6)(B). Thus, in my recounting of the facts, I focus on what happened while A.F. was in seventh and eighth grade. Nevertheless, I begin with A.F.'s sixth-grade year, because the District's knowledge about A.F.'s struggles in sixth grade informs the scope of the District's obligations during the limitations period. *See Spring Branch*, 961 F.3d at 793 n.11; *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1083 (8th Cir. 2020). Similarly, some of the events from A.F.'s ninth-grade year shed light on the propriety of the District's conduct while A.F. was in eighth grade.

## I.    Sixth Grade

A.F. entered sixth grade at Marshwood Middle School ("**MMS**" or the "**School**") in fall of 2016. Hr'g Tr., Test. of Ms. H. ("**Mother's Test.**"), 28:9–10; Hr'g Tr., Test. of Sarah Camp ("**Camp Test.**"), 844:20–22, 845:21–22, 848:11–15. And Mother noticed a major shift in A.F.'s behavior, including his sudden refusal to go to school. Mother's Test., 28:14–17, 31:15–23.

Based on the record, MMS was unaware that A.F. was having difficulties until the second semester of his sixth-grade year.[7] On January 30, 2017, Mother emailed one of A.F.'s teachers to tell her that A.F. did not feel like he fit in, that he had been struggling at home, and that getting him to school had been challenging.[8] R. at 1066, 2370–71; Mother's Test., 29:9–24, 486:20–487:14. A.F.'s teachers confirmed that they had noticed some changes in his behavior. R. at 1066–67, 2370, 2372.

That same week, Mother told Sarah Camp, A.F.'s guidance counselor, that A.F. had met with a doctor who worried "how much his anxiety [was] impacting his functioning" and that A.F. was going to be put on medication. R. at 1067, 2374; Camp Test., 844:20–24. Then, on February 12, 2017, Mother emailed Ms. Camp to request a 504 plan for A.F.'s "AD/HD" and anxiety. R. at 2381. Ms. Camp responded that once Mother provided documentation,[9] the School could schedule an initial meeting to see

---

[7]      A.F.'s parents (the "**Parents**") had known that A.F. had psychological difficulties since he was six years old when he was evaluated by a psychologist who noted that he exhibited anxiety and attention problems. R. at 825–32; Hr'g Tr., Test. of Ms. H. ("**Mother's Test.**") 22:23–23:7. Ms. H. ("**Mother**") claimed to have shared this evaluation with "the school." Mother's Test., 23:8–9, 24:10–12. While it is not clear to which school she was referring, the Due Process Hearing Officer ("**DPHO**") concluded that this report was never provided to MSAD #35 (the "**District**"). *See* R. at 21 n.2; Hr'g Tr., Test. of Katherine Barber ("**Barber Test.**"), 1450:25–1451:21. Because it is supported by sufficient evidence, I defer to the DPHO's finding that this report was not provided to the District.

[8]      In evaluating when a district's child find obligation is triggered, several of the courts of appeals have focused on what "school officials" know or have reason to know. *See, e.g., Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012); *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). In this case, District policy says that any staff member may make a special education referral, that all staff members "who observe that a student is encountering academic or functional difficulties in school that interfere with the student's education" must document those difficulties, and that the District will notify a student's parents of any difficulties documented by its staff. R. at 2340, 2342. I assume from the case law and from these District policies that the District is deemed to be on notice of all information relevant to its child find obligation that is known by any member of its staff.

[9]      School protocol at the time was to ask for medical documentation prior to implementing accommodations pursuant to Section 504 (a "**504 plan**"). Hr'g Tr., Test. of Sarah Camp ("**Camp Test.**"), 855:17–856:4. In the alternative, the District could have had A.F. evaluated, but it is quicker

if A.F. qualified for accommodations pursuant to a 504 plan (a "**504 meeting**"). R. at 2381.

A few days later, Mother emailed Ms. Camp again to tell her that A.F. had major anxiety around school and to ask whether Heather Blier, a psychologist, could help A.F. or his teachers with A.F.'s anxiety or depression. R. at 1063, 2387. Ms. Camp responded that Dr. Blier works with special education students, and Ms. Camp did not directly address Mother's concerns. R. at 1063, 2387.

Two weeks later, Ms. Camp observed A.F. in the cafeteria with his head down, not eating, and when she spoke with him, he expressed feelings of anxiety. R. at 1062, 2390; Camp Test. 853:22–854:9. Up to this point, Ms. Camp had not observed any noticeable changes regarding A.F.'s behavior in school. Camp Test., 854:10–14. Ms. Camp consulted A.F.'s teachers about instituting a 504 plan, but they did not think such a plan was necessary at that time. R. at 1062, 2390; Camp Test., 857:19–858:9.

The following day, on March 3, 2017, a psychiatrist, Dr. Joshua Gear, evaluated A.F. and diagnosed him with anxiety and attention-deficit/hyperactivity disorder, predominately inattentive type ("**ADHD**"). R. at 791, 1589. But there is no evidence that these diagnoses were shared with the District until the following school year, nor is there any evidence that Mother shared any additional concerns with the District (or vice versa) for the remainder of A.F.'s sixth-grade year.

---

and easier to implement a 504 plan based on medical documentation when there has already been a diagnosis, as with A.F. Camp Test., 856:3–12.

As will later become clear, it is also relevant to this case that when A.F. was in sixth grade, Mother referred her daughter (A.F.'s younger sister), N.F., for special education in the District. Mother's Test. 533:17–534:7. N.F. was dyslexic and had an IEP involving direct instruction in math and reading. Mother's Test., 50:21–51:9.

## II.    Seventh Grade

On August 30, 2017, a few days before A.F. entered seventh grade, Mother emailed Sarah Camp to renew her request for a 504 plan for A.F.'s ADHD and anxiety. R. at 1035, 1664, 2402. Ms. Camp responded, as before, that the School needed medical documentation but that a 504 meeting could be held around mid-October after A.F.'s teachers had had some time to get to know him. R. at 1034–35, 2401–02. On September 21, 2017, Dr. Gear wrote a letter documenting A.F.'s anxiety and ADHD diagnoses and recommending that A.F. be considered for a 504 plan or an IEP. R. at 791, 1589. Ms. Camp received this letter a few days later and promptly scheduled a 504 meeting. R. at 1033–34, 2403, 2405.

At the 504 meeting, which was held on November 14, 2017, Mother shared A.F.'s diagnoses and explained that his transition to MMS from elementary school the prior year had been difficult. R. at 785, 1590. She commented that he had been withdrawn and loath to come to school but that now he was engaged, getting him to school was easier, and he was continuing to improve. R. at 785, 1590; Mother's Test., 61:6–17; Camp Test., 865:22–25; *see also* R. at 2417. A.F.'s teachers expressed no concerns about him, and while Ms. Camp acknowledged that A.F. had struggled in sixth grade, she considered him to be "a different kid now." R. at 785, 1590; Camp Test., 865:2–19. Ultimately, the participants at the 504 meeting (the "**504 team**")

concluded that A.F. had a disability (his anxiety and ADHD) but that because his disability only mildly impaired his learning and only moderately impaired his concentration, he did not qualify for a 504 plan.[10] R. at 785, 787–88, 1590, 1592–93.

After this meeting, A.F.'s seventh-grade year continued to go quite smoothly. Hr'g Tr., Test. of Peter Ryan ("**Ryan Test.**"), 1270:8–1271:6, 1272:4–12, 1274:4–7; Mother's Test., 505:4–12. Sarah Camp continued to monitor A.F. and to check in with his teachers, who believed that A.F. was thriving, not just academically but socially and emotionally. Camp Test., 867:2–15. Mother did not share any concerns except that she told A.F.'s gym teacher on February 18, 2018, that A.F. was having difficulty managing reciprocal friendships and that she wondered whether he had social skills issues. R. at 1025, 2435.

In late May, things changed. On May 29, 2018, Peter Ryan, A.F.'s math teacher, notified the Parents that he was concerned about changes in A.F.'s behavior: "His effort on work seems to have dropped a bit lately comparative to the beginning of the year. Early in the year I was getting complete work and his best effort, [and] it seems recently (this quarter) his work is rushed and not complete in thought." R. at 1012, 2448. Mr. Ryan surmised that this change in focus might have been due to a recent schedule change, such that A.F.'s math class was now at the end of the day,[11]

---

[10]     Section 504 only applies to "individual[s] with a disability," 29 U.S.C. § 794(a), defined in relevant part as an individual with "a physical or mental impairment that substantially limits one or more major life activities," *id.* § 705(20)(B); 42 U.S.C. § 12102(1)(A). As a result, a mild or moderate impairment is not sufficient to invoke the protections of Section 504 and thus to necessitate a 504 plan.

[11]     It appears that Marshwood Middle School ("**MMS**" or the "**School**") rearranges students' schedules each quarter, even if the classes they are taking do not necessarily change. *See* R. at 2476.

by which time he might be sapped of energy. R. at 1012, 2448. In response, Mother made another request for a 504 plan, and Sarah Camp set up a 504 meeting for the following week. R. at 1012, 2448–50.

On Friday, June 8, 2018, just one school day before the end of the school year, the 504 team reconvened. R. at 779, 1618, 1664. At this meeting, it was reported that A.F.'s teachers had noticed that he was less engaged in the classroom, he would sometimes appear distracted, and he was struggling "bringing a task to completion." R. at 779, 1618; Camp Test., 875:6–14 ("It was an occasional problem[,] but it was a change."); Ryan Test., 1278:6–16, 1280:1–7. Mother shared with the group that A.F. was struggling to hold himself together at school and that when he would come home, he would be fatigued and "checked out," and he would spend hours on the swing set like he was trying to regulate himself. R. at 779, 1618; Mother's Test., 73:25–74:9; Camp Test., 874:16–21. These self-regulation issues were not apparent at school. Camp Test., 874:22–25; 898:17–899:10.

Given this change in behavior, the 504 team determined that A.F.'s ADHD and anxiety were "substantial[ly]" impairing his ability to concentrate, due to his tendency to internalize his emotions, and that he now qualified for a 504 plan. R. at 526, 779, 781–82, 1611, 1614–15, 1618. The 504 plan laid out expectations for A.F.'s teachers and for A.F. himself. R. at 527, 1612. A.F.'s teachers were expected to provide him with various classroom accommodations (e.g., preferential seating and extra time). R. at 526, 1611. A.F., meanwhile, was expected to advocate for himself by articulating his needs when he felt overwhelmed or if he was in need of clarification,

to stay after school for academic support as needed, and to keep track of his schoolwork.[12] R. at 527, 1612.

## III. Eighth Grade

### A. First Semester Struggles, Mother's Request for a Neuropsychological Evaluation, and another 504 Meeting

A.F.'s eighth-grade year started off without incident, Camp Test., 881:13–18; Ryan Test., 1281:17–1282:6, 1284:10–15, but things quickly changed. Mr. Ryan noticed that A.F.'s binder started to become disorganized.[13] Ryan Test., 1285:11–17, 1287:2–11. And six weeks into school, on October 17, 2018, the Parents emailed A.F.'s teachers to let them know that he was struggling to concentrate in his afternoon classes due to the waning effects of his medication as the day stretched on. R. at 1001, 2332, 2469.

Mother sought help from Ms. Camp, who stated that they could discuss ways to assist A.F. at an upcoming 504 meeting, which had been scheduled for October 24, 2018. R. at 999, 2467, 2471, 2473. Around this time, Ms. Camp became aware that A.F. was beginning to feel overwhelmed with work and that he had some missing assignments; however, this did not raise any red flags for her because this was not atypical for an eighth-grader. Camp Test., 886:18–887:8 ("[P]art of [middle schoolers'] development is they're learning executive functioning skills, they're learning how to

---

[12]     A 504 plan typically includes student expectations to help students develop self-advocacy skills and become more self-directed learners, and students act to fulfill these expectations with teacher support. Camp Test., 891:4–12; Hr'g Tr., Test. of Peter Ryan ("**Ryan Test.**"), 1293:7–15.

[13]     Peter Ryan's observations of A.F. are particularly valuable because, coincidentally, Mr. Ryan was moved to eighth grade when A.F. started eighth grade, Ryan Test., 1281:14–23, so Mr. Ryan is the only teacher who taught A.F. in both seventh and eighth grade.

be organized, [and] they're learning how to be independent and turn in assignments on time . . . but many students sometimes would have missing assignments."); *see* Ryan Test., 1288:13–1289:13.

On October 24, just before the 504 meeting was scheduled to begin, Mother sent an email to Ms. Camp, Anthony Bourbon (the MMS principal), and Carole Smith (the District's then-Director of Special Services) requesting that "a neuropsychological evaluation . . . be completed this school year to address executive functioning concerns[14] stemming from ADHD and anxiety disorders impacting [A.F.'s] . . . ability to fully access his education." R. at 998, 2467, 2475; Mother's Test., 61:2–3. Ms. Smith immediately responded to this email, thanking Mother for "refer[ring A.F.] to special education" and stating that she intended to ask Sarah Camp to call her so they could "initiate this referral."[15] R. at 998, 2475.

Later that morning, at the 504 meeting, Mr. Ryan reported that A.F.'s teachers had noticed that he had been rushing through his assignments and that he was disorganized, particularly in comparison to the prior year. R. at 776–77, 1633–34. This was a change for A.F., if not out of the norm for a typical middle schooler. Camp Test., 888:7–9. A.F.'s English and Language Arts ("**ELA**") teacher, Tracy LaPointe, also observed that he "look[ed] wiped out by the end of the day." R. at 2476. Mother

---

[14]    "Executive skills are the skills that are required to execute tasks—to take an idea from start to finish . . . ." R. at 1137. They include things like sustained attention, organization, time management, planning/prioritization, emotional control, and goal-directed persistence. R. at 1138. Executive skills can be taught just like coursework can be. R. at 1137.

[15]    The District typically treats a parent request for an evaluation as a special education referral. Barber Test., 1449:9–1450:2.

reported at this meeting that A.F. had been picking at his hair and scalp and that she believed that his executive functioning and coping skills needed additional support. R. at 777, 1634.

Based on this meeting, the 504 team mostly maintained the status quo. *Compare* R. at 774–75, 1631–32, *with* R. at 526–27, 1611–12. However, A.F.'s 504 plan was slightly modified to note his difficulty with organization and to add the expectation that he would work with Mr. Ryan, including after school, to identify and practice organizational strategies. R. at 774–75, 1631–32.

### B.      Referral to Special Education

Subsequent to this meeting, Sarah Camp initiated A.F.'s referral to special education, which Katherine Barber, the District's then-Assistant Director of Special Services,[16] approved. R. at 763–72, 1635–44, 2478. The referral noted that A.F. "rushes through his work" and identified that A.F. had various behavioral and social/emotional weaknesses, including in attention and concentration, planning and organization, and self-esteem. R. at 764–65, 1636–37. Ms. Camp notified Mother that a meeting to assess A.F.'s eligibility for an IEP (an "**IEP meeting**") would be scheduled soon. R. at 2479.

Once a special education referral has been made, District policy requires an IEP team consisting of the Parents and representatives of the District (the "**IEP team**") to review existing evaluation data and to determine the need for additional evaluations. R. at 750–52, 2341. If additional evaluations are needed, the District

---

[16]     Ms. Barber became the Director in July 2019. R. at 2365.

must seek parental consent within fifteen school days of receipt of the referral. R. at 2341. And once consent is received, the District has forty-five calendar days to complete the evaluation and to hold an IEP meeting to determine eligibility. R. at 2341. If a child is found eligible, the IEP must be developed within thirty calendar days of the eligibility determination. R. at 2341.

In the weeks leading up to the IEP meeting, Mother repeatedly raised concerns about A.F.'s performance in school. On October 31, 2018, she emailed his teachers and Ms. Camp to tell them that he was struggling and that he had never had this hard of a time before. R. at 980–81, 987–88, 2484. On November 6, Mother emailed Ms. LaPointe to tell her that A.F. had received a poor grade on his ELA binder "most likely [as] a direct result [of] his executive skills deficits" and asked if this was something for which he could receive support. R. at 980, 2488. Mother continued: "I do think there could be growth with support from staff in the areas of paying attention, organization, planning, task completion, and staying focused until [a] task is completed." R. at 980, 2488. The same day, Mother told Ms. Camp that she was looking for an executive skills coach and asked whether MMS had any teachers with a background in executive skills coaching. R. at 987, 2488. Ms. Camp responded that she was unsure but that she was happy to ask around. R. at 987. It is unknown whether Ms. Camp ultimately did so, but regardless, nothing came of this request.

On November 16, 2018, Mother emailed Mr. Ryan to express her concerns that not all of A.F.'s teachers "really understand his challenges." R. at 2493. She also told Mr. Ryan that she believed that A.F.'s focus issues went beyond just his issues with

organization. R. at 2493. She said: "My true belief is that his [ADHD] and anxiety are not being managed optimally and that is why he seems checked out." R. at 2493.

### C.    The November 2018 Meeting

On November 28, 2018, the District held what began as an IEP meeting to assess A.F.'s "[i]nitial referral/eligibility" for special education (the "**November 2018 meeting**"). R. at 750, 1645, 1648. At this meeting, Mother expressed concerns that although A.F.'s grades were good,[17] his executive functioning skills were impacting his ability to access his education. R. at 751, 1649; Camp Test., 896:11–20. In particular, she described how A.F. was not feeling successful at school, and how he was struggling with organization, his ability to turn work in, and his peer relationships. R. at 751, 1649. Ms. Camp confirmed that A.F.'s teachers had seen a change in his organization, that A.F. often looked tired, that he internalized his stress, and that he worked hard to "keep it together" at school. R. at 751, 1649. Ms. Camp did not, however, believe that A.F.'s organizational difficulties were having a significant impact on his ability to access his education. Camp Test., 896:22–897:1.

Mr. Ryan agreed that A.F. had changed from the previous year and that he was struggling to get through the day. R. at 751, 1649. He had also observed that A.F. was exhausted by the end of the day and was reluctant to stay after school for help. R. at 751, 1649; Ryan Test., 1296:8–14. This was concerning to Mr. Ryan because A.F.

---

[17]    Although A.F.'s good grades were repeatedly raised at the 504 and individualized education program ("**IEP**") meetings (seemingly as purported justification for A.F. not requiring special education), Mother was not concerned about A.F.'s grades, but rather about other issues impacting his education, like his forgetfulness and his lack of focus and social skills. Mother's Test., 100:10–101:5 ("[G]rades are one measure of success but he was not successful at school.").

was not accessing the part of the 504 plan that required him to seek extra help as needed. Ryan Test., 1296:15–19.

What followed after this discussion about A.F.'s struggles is hotly contested. The only documentary record of the November 2018 meeting is a "Written Notice" that the District provided to the Parents, R. at 750–53, 1648–51, seemingly to comply with the IDEA's written-notice obligation, *see* 34 C.F.R. § 300.503. The District treats the Written Notice document as the minutes of the meeting, and I do the same. R. at 754, 1652. This document (the "**November 2018 minutes**" or the "**minutes**") was created by an MMS secretary who was the dedicated note taker at the November 2018 meeting. Hr'g Tr., Test. of Katherine Barber ("**Barber Test.**"), 1553:12–1554:15. Among other things, the minutes purport to "[d]escribe the action(s) . . . proposed or refused by the" District, to "[e]xplain why" the District was "proposing or refusing" to act, and to describe any other relevant factors. R. at 751–52, 1649–50.

The minutes reflect that the IEP team "had a discussion about evaluations," and that Mother stated that she did "not want [A.F.] to receive special education services" and that she did "not feel that [he] requires special education." R. at 751–52, 1649–50. According to the minutes, "it was agreed that [A.F. did] not require testing under special education" and that Mother "was in agreement with" that determination. R. at 751, 1649.

Of the seven IEP team members at this meeting, R. at 752, 754, 1650, 1652, five testified at the due process hearing: Mother, Sarah Camp, Dr. Thomas Grebouski (a psychologist who the school contracted to evaluate A.F.), Peter Ryan, and

Katherine Barber. Because I consider the November 2018 meeting to be a pivotal event, I summarize the testimony of each of these individuals.

- Mother testified that she stated at the meeting that she did not think that A.F. needed special education and that she did not want him to receive special education services. Mother's Test., 102:7–11, 530:1–5, 535:11–13. Mother testified that nobody from the District explained to her at this meeting the difference between a 504 plan and an IEP, or that special education would have allowed A.F. to receive direct instruction in, and accommodations for, his executive functioning and social skills deficits. Mother's Test., 102:21–103:6. Mother testified that as soon as she said that she did not think A.F. needed special education, the District concluded the IEP meeting. Mother's Test., 103:7–11.

- Sarah Camp testified that the IEP team "discussed different options for testing" and that after Mother "had indicated that she didn't want special education services," Dr. Grebouski brought up the idea of conducting an evaluation pursuant to the 504 plan. Camp Test., 899:18–23. Ms. Camp could not recall why Mother did not want A.F. to receive special education. 899:24–900:1. Ms. Camp acknowledged she had never explained to Mother that A.F. could learn executive functioning or pragmatics skills through special education. Camp Test., 1065:12–19. Ms. Camp could not recall whether anyone at the November 2018 meeting had explained to Mother that a 504 evaluation could take longer than a special education evaluation. Camp Test., 1066:5–14.

- Dr. Grebouski testified that Mother told the IEP team at the November 2018 meeting that she did not want A.F. to receive special education. Hr'g Tr., Test. of Thomas Grebouski ("**Grebouski Test.**"), 1139:19–21. Dr. Grebouski testified that the District could not "go through the special ed[ucation] channel" because "the Parents did not want that to happen" since they did not "feel the need for [A.F.] to receive special education services" and they did not "want him identified under IDEA as a student with special needs." Grebouski Test., 1140:6–17. Dr. Grebouski testified that the IEP team discussed the differences between Section 504 and the IDEA "in terms of what that would indicate" and how an IDEA evaluation could result in an IEP whereas a 504 evaluation would focus more on whether there should be any additions or changes to the 504 plan that was already in place. Grebouski Test., 1141:9–19. Dr. Grebouski testified that the IEP team discussed the difference between the services that an IEP could provide as compared to the accommodations that a 504 plan could provide, but the discussion focused more on "how well [A.F.] . . . [could] do academically as opposed to the challenges that he was having that were limiting his ability to access his education." Grebouski Test., 1141:20–1142:4. Dr. Grebouski testified that the IEP team also discussed how A.F.'s struggles

were "considered more in terms of the 504" plan as opposed to "a program of individualized instruction." Grebouski Test., 1142:7–17.

- Peter Ryan testified that Mother did not want A.F. to receive special education and that "the testing was decided to be done through the 504 plan" and that all who were present "were amenable to that." Ryan Test., 1297:1–9. When asked why Mother "didn't want special education testing or services at this point," Mr. Ryan responded that he did not know. Ryan Test., 1297:10–13.

- Katherine Barber testified that because Mother "was very adamant she did not want special ed[ucation] services," the IEP team "honored that request" and pursued the 504 evaluation instead. Barber Test., 1455:10–15. Ms. Barber testified that the IEP team discussed that special education could address A.F.'s deficits but acknowledged that this was not reflected in the minutes. Barber Test., 1562:16–1564:1. Ms. Barber testified that she talked about the difference in timing between a 504 and an IEP evaluation and how if A.F. had an IEP evaluation, the IEP team would meet after he was evaluated and assess his eligibility for an IEP. Barber Test., 1453:24–1454:10. Ms. Barber also appears to have testified that she and Mother discussed how an IEP is not limited to dyslexia. *See* Barber Test., 1453:24–1455:3 (apparent reference to the fourteen different qualifying disabilities under Maine law). Ms. Barber also testified that, based on the conversations at the November 2018 meeting, she believed that Mother understood "the difference between 504 and special ed[ucation]," but she acknowledged that no conversation about this difference is reflected in the minutes. Barber Test., 1455:5–9; 1561:5–8.

By the time of the November 2018 meeting, everyone agreed that A.F. should be evaluated. The District wanted to evaluate A.F. to determine whether his previously-diagnosed ADHD and anxiety were impacting his education. Barber Test., 1456:4–10. But, because Mother voiced that she did not believe A.F. required special education, the decision was made to have A.F. evaluated pursuant to the 504 plan rather than pursue a special education referral. R. at 751, 1649.

Because it was decided that A.F. would receive a 504 evaluation rather than an IDEA evaluation, this meant that A.F.'s evaluation would be conducted according to the more flexible timeline of Section 504 rather than within the confines of the strict time limit outlined in the IDEA. A 504 evaluation need only be conducted within

"a reasonable amount of time." Barber Test., 1565:14–15. But for an evaluation conducted pursuant to the IDEA, a school district has forty-five school days from the time of parental consent to not only conduct the evaluation, but also to assess the child's eligibility for an IEP. MUSER § V(1)(A)(3)(a); Barber Test., 1456:18–24.

Once the decision was made that A.F. would receive a 504 evaluation rather than an IDEA evaluation, the IEP meeting morphed into a 504 meeting, and the 504 team selected Dr. Grebouski to conduct the 504 evaluation. R. at 751, 755 1649, 1653. At the conclusion of the meeting, Mother consented to a 504 evaluation of A.F. that would "explore [his] executive" and "social emotional functioning." R. at 752, 755, 1650, 1653. That evaluation did not occur until February 4, 2019, and Dr. Grebouski's report was not completed until February 28, 2019. R. at 712, 1665. Had the team stayed on the IDEA track, the parties agree that the evaluation *and* the IEP meeting to determine eligibility would have had to have occurred by February 8, 2019. Barber Test., 1456:18–24, 1457:18–25.

### D.    A.F.'s Downward Spiral

While Dr. Grebouski's evaluation remained pending, Mother continued to raise concerns with the School about A.F.'s executive functioning skills. One week after the November 2018 meeting, Mother emailed Mr. Ryan to say that A.F. had met with an executive skills coach (paid for by the Parents) and that he was "finding the more time that goes on in the day the harder it is for him." R. at 2499; Mother's Test., 108:2–22. In December, Mother began noticing that A.F.'s grades were slipping and that this appeared to be due to his failure to complete or turn in some of his assignments. R. at 979–80, 2505, 2508–09, 2515–16. Because of this, on December

15, 2018, Mother expressed concerns to A.F.'s teachers about his executive functioning skills, stating that "his disability makes fully accessing [his] knowledge a challenge due to executive skills," and she reminded his teachers to stay on top of A.F. and to be sure to provide him with the accommodations outlined in the 504 plan. R. at 979–80, 2505, 2508–09, 2515–16.

During this time, A.F.'s behavior was erratic. In mid-December, Mother informed the School that she was keeping A.F. home from school for a few days while the Parents adjusted his medication. R. at 2519, 2522. When A.F. was at school, his failure to turn in assignments became more frequent, and in late December, his demeanor changed, and he was increasingly tardy for class. Ryan Test., 1298:22–1299:2, 1300:20–1301:10. After winter break, A.F. seemed to have improved for a few weeks. Ryan Test., 1301:18–1302:2; R. at 2531–32. And on January 3, 2019, Mother and Mr. Ryan exchanged emails discussing how they had noticed improvements in A.F.'s mood and attitude, a shift that Mother attributed to A.F.'s medication change. R. at 2531. A few days later, Mother informed the School that A.F. was sick but that his anxiety was disappearing. R. at 2539–40. Mother told the School that she initially suspected that A.F. had mononucleosis, but that he had tested negative. R. at 2539–40. Mother testified that she was having trouble getting A.F. to go to school during this time, although she did not inform the School. Mother's Test., 121:7–122:5, 545:8–24.

In February 2019, things took a turn for the worse. Around February 8, 2019, rejection by a classmate while playing video games left A.F. sobbing on the kitchen

floor, feeling like he did not fit in. R. at 939, 2564–67; Barber Test., 1462–63. On February 14, 2019, Mother emailed Mr. Ryan and Ms. Camp to tell them that A.F. did not feel supported by certain teachers and that he did not feel comfortable advocating for himself, which contributed to his anxiety. R. at 936, 938, 939, 2564–66. She also opined that A.F. needed more executive functioning support, as well as a smaller and more nurturing environment, and indicated that she was considering homeschooling her son. R. at 936, 938, 939, 2564–66. Mother also called Carole Smith and told her that she was thinking about homeschooling A.F. R. at 934–35, 2568–69.

On February 16, 2019, Mother and Katherine Barber spoke on the phone. R. at 2575; Barber Test., 1461:19–1463:24. Mother informed Ms. Barber about the recent video game incident and told Ms. Barber that she was considering pulling A.F. out of MMS. R. at 2573; Barber Test., 1462:2–12. Ms. Barber encouraged Mother to wait for Dr. Grebouski's report and said that, in the interim, she would talk to A.F.'s teachers about ways to keep A.F. engaged in school and with his peers. R. at 2575; Barber Test., 1462:12–1463:24.

Around this same time, some teachers began noticing that A.F. was again having a hard time keeping up with his workload. Camp Test., 906:14–18. Although Sarah Camp and Peter Ryan were aware of A.F.'s continued struggles, they decided against making an IDEA referral because they hoped that Dr. Grebouski's evaluation would provide more information on A.F.'s needs. Camp Test., 906:19–907:2; Ryan Test., 1302:4–5, 1303:3–12.

By February 2019, the Parents were having great difficulty getting A.F. to go to school, Mother's Test., 123:17–22, although there is no evidence in the record that they shared this issue with MMS. On February 25, 2019, Mother unenrolled A.F. from school only to reenroll him a few days later. R. at 2578, 2587; Mother's Test. 271:22–273:9. Mother told Dr. Grebouski that the Parents were considering having A.F. hospitalized, R. at 2576, and she began to research school refusal programs, Mother's Test., 124:4–12. Through this research, Mother learned about a School Anxiety/School Refusal program at the AMITA Alexian Brothers Behavioral Health Hospital ("**AMITA**") in Illinois. Mother's Test., 143:12–18.

### E.    Dr. Grebouski's Evaluation

Dr. Grebouski evaluated A.F. on February 4, 2019, and completed his report on February 28, 2019. R. at 712, 1665. His report was provided to the Parents the following day. R. at 2586. Dr. Grebouski's testing included having Mother and Mr. Ryan rate A.F. on various behavioral scales. R. at 719–21, 1672–74. Dr. Grebouski found the results of his testing to be consistent with A.F.'s ADHD diagnosis, concluded that A.F.'s attention issues were exacerbated by depression and anxiety, and diagnosed A.F. with ADHD and generalized anxiety disorder. R. at 720–22, 1673–75.

Dr. Grebouski refrained from making any specific educational recommendations for A.F. in his report, because Mother had told him before he had completed his report that A.F. was going to be taking a medical leave from school and that the Parents were considering having him hospitalized. R. at 722, 1675 ("As he is currently pending an extended stay treatment program . . . educational

recommendations at this moment will not reflect his needs once he completes that program and returns."), 2576. However, Dr. Grebouski opined that A.F.'s 504 plan was sufficient to address his needs and that A.F. did not require an IEP. Grebouski Test., 1167:3–22; R. at 722, 1675.

After receiving and distributing Dr. Grebouski's report on March 1, 2019, the District immediately scheduled a 504 meeting for March 19, 2019, to review the report. R. at 2585–86. Although the District knew that Mother would be in Illinois at AMITA, the District thought it important to have a meeting to review Dr. Grebouski's report as soon as possible and offered to have Mother participate via phone. R. at 2583–86.

### F.    A.F.'s Admission to AMITA and Dr. Jasinski's Evaluation

On February 28, 2019—the same day that Dr. Grebouski completed his report—Mother drove A.F. to AMITA, and on March 5, 2019, he was admitted to the hospital to participate in the program. Mother's Test., 143:12–18; R. at 604, 712, 1665. Upon admission, the intake coordinator immediately recommended that A.F. see Dr. Shubhrajan Wadyal, a psychiatrist who headed up AMITA's autism clinic, and Dr. Wadyal diagnosed A.F. with Asperger's syndrome after a seventy-minute meeting.[18] R. at 1298, 1301; Mother's Test., 144:7–15, 145:13–20, 146:11–12. Dr.

---

[18]    Asperger's syndrome was one of five pervasive developmental disorders previously listed in the Diagnostic and Statistical Manual of Mental Disorders ("**DSM**"), 4th Edition ("**DSM-IV**"). R. at 421, 2306. Individuals with Asperger's syndrome have impairments in social, occupational, and other important areas of functioning but lack the delays in language or cognitive development characteristic of another developmental disorder, autistic disorder. R. at 421, 2306. The 5th Edition of the DSM ("**DSM-V**"), published in 2013, collapses four previously separate categories of autism into one umbrella diagnosis of "autism spectrum disorder." R. at 421, 1085, 2306; *see also* Mother's Test., 145:13–20.

Wadyal then suggested that A.F. undergo a neuropsychological evaluation and referred him to a neuropsychologist with experience working with teenagers and adults with autism, Dr. Nicholas Jasinski. Mother's Test., 147:8–15; Hr'g Tr., Test. of Nicholas Jasinski ("**Jasinski Test.**"), 341:21–342:20. Dr. Jasinski met with A.F. twice in March to complete his neuropsychological evaluation. R. at 638, 1730. On March 29, 2019, A.F. was discharged from AMITA. R. at 604, 1710.

### G. The March 19, 2019, 504 Meeting; a Reentry Meeting; Dr. Jasinski's Report; and Two IEP Meetings

On March 19, 2019, while A.F. was still participating in the AMITA program, the 504 team (including Mother via phone) convened to discuss Dr. Grebouski's report. R. at 633–35, 1727–29. At this meeting, Dr. Grebouski informed the 504 team of his conclusions, including that A.F.'s anxiety could explain his social difficulties and his reluctance to go to school and that, while depression was intermingled with the conditions that he had diagnosed, it was not A.F.'s primary condition. R. at 634–35, 1728–29. Mother mentioned that A.F. had been diagnosed with autism. R. at 633–35, 1727–29. Dr. Grebouski opined that he saw no evidence of autism or Asperger's syndrome, and, based on A.F.'s presentation,[19] he ruled out both. R. at 633–34, 1727–28.[20] At the conclusion of the meeting, A.F.'s previous 504 plan (from October 2018) remained in place. *Compare* R. at 1725–26, *with* R. at 774–75, 1631–32.

---

[19]     This conclusion appears to be based primarily on one of the tests that Dr. Grebouski conducted, the Minnesota Multiphasic Personality Inventory ("**MMPI**"). R. at 634, 719, 1672, 1728. Dr. Grebouski opined that if autism were an area of concern, A.F.'s MMPI results would have looked "profoundly different." R. at 634, 1728.

[20]     Dr. Grebouski did not conduct a full evaluation for autism because he did not have permission to do so. Hr'g Tr., Test. of Thomas Grebouski ("**Grebouski Test.**"), 1143:16–1144:8; R. at 755, 1653. He was only authorized to administer tests within the scope of the parental consent that was provided,

The day after this 504 meeting, the District sought to schedule an IEP meeting for when the Parents returned from Illinois,[21] originally settling on April 10, 2019. R. at 2595; Barber Test., 1469:13–1470:13. The District then asked to push back this meeting one day to allow a consulting neuropsychologist to attend, and the Parents consented. R. at 2602, 2626. But soon thereafter the Parents realized that they were going out of town for a family vacation on April 10, and Father asked for the meeting to be postponed. R. at 911–12, 2604. The District offered to hold the IEP meeting sooner, but Mother did not want the meeting to be scheduled before Dr. Jasinski's evaluation was completed. R. at 2604. At some point, the District also scheduled a reentry meeting for April 9 to transition A.F. back to MMS. *See* R. at 892, 2622–23.

On April 8, 2019, Ms. Barber informed the Parents that the District was initiating a second special education referral for A.F., this time based on Mother's mention of A.F.'s autism diagnosis at the recent 504 meeting. R. at 585, 624, 1757, 2622–23; Barber Test., 1469:13–1470:2. Ms. Barber also told Mother that the previously-scheduled reentry meeting would need to be rescheduled as an IEP meeting for a time when the Parents could be present. R. at 892, 2622–23. In the special education referral, Ms. Barber described A.F.'s social skills deficits, as well as his diminished focus in the classroom. R. at 587, 1759. And she noted that A.F.'s

---

and to go beyond that, he would have had to request further evaluation from the School and get consent from the Parents. Grebouski Test., 1144:18–22.

[21]    On March 31, 2019, Mother emailed one of A.F.'s teachers to notify her of A.F.'s return to Maine. R. at 2610.

teachers had noticed a shift in his attention beginning in late December/early January. R. at 587, 1759.

Mother thanked Ms. Barber for initiating this referral and stated that she wanted to go forward with an IEP meeting but that she was not comfortable with A.F. returning to MMS. R. at 877, 2624. Rather, she wanted him to complete eighth grade in an alternative educational program. R. at 877, 2624. She still wanted the IEP team to develop an IEP with the goal that it would be implemented when A.F. started at Marshwood High School ("**MHS**") the following year. R. at 877, 2624.

Although Mother considered pulling A.F. out of school, he ended up returning to MMS. He came to school on April 24 for part of the day, and he continued to come in for at least partial days thereafter.[22] R. at 2632–33, 2642. Given this, Mother asked Ms. Barber to schedule a reentry meeting for A.F. as soon as possible. R. at 2642–43. That reentry meeting was held on April 30, 2019, and some modifications were made to A.F.'s 504 plan. R. at 597, 2651; Camp Test. 916:23–918:6.

Dr. Jasinski completed his report in late April, concluding that A.F. demonstrated an impaired ability to regulate or utilize his executive functioning abilities to their full capacity. Jasinski Test., 353:18–355:10 ("[H]e may understand cognitively that [he] need[s] to be organized for school . . . but his ability to regulate himself, keep information regulated in his mind, regulate his mood, regulate his reaction to things, that gets in the way of him using his ample cognitive abilities to

---

[22]   After A.F. returned to school, he began to stay for the full day, he was not accessing the nurse's office to rest, he was not going to see Ms. Camp, and his teachers noticed that he seemed more comfortable. Camp Test., 924:12–21.

be able to function at the level that he's capable of."). Dr. Jasinski also concluded that there was "a high probability" that A.F. had autism spectrum disorder, as well as ADHD. R. at 641, 1733; Jasinski Test., 368:4–6. This conclusion fit with the rest of A.F.'s profile because school refusal is common in autistic children and because anxiety and depression are very common in individuals with autism spectrum disorder and ADHD. Jasinski Test., 370:22–23, 373:20–375:21. That is, while anxiety can itself be a disorder, it can also be a symptom, and Dr. Jasinski concluded that A.F.'s anxiety was a symptom of his autism spectrum disorder and ADHD. Jasinski Test., 370:12–20, 371:16–18. He also attributed A.F.'s depression to the distress caused by his undiagnosed autism spectrum disorder. R. at 641, 1733; Jasinski Test., 370:20–23. Mother provided Dr. Jasinski's report to the District on April 28, 2019. R. at 2647.

On May 9, 2019, the District convened an IEP meeting to review Dr. Jasinski's evaluation and to discuss whether A.F. was eligible for special education. R. at 561–65, 1771–75. At this meeting, the Parents shared a list of concerns that they had regarding A.F.'s potential IEP. Hr'g Tr., Test. of Mr. F. ("**Father's Test.**"), 772:12–17; Barber Test., 1092:1–1093:6; R. at 577–78. Among these concerns was the Parents' belief that A.F. was eligible for special education under two categories of eligibility, autism and OHI (due to his ADHD). R. at 577–78; Barber Test., 1092:23–1093:6.

The District did not think it had sufficient information to categorize A.F. as eligible for special education under the autism category because he did not exhibit a

34

severe impairment in language[23] and he had not had an evaluation to assess for language deficits. R. at 1850–52; Barber Test., 1483:19–1484:1, 1495:12–19. The District did not offer to find A.F. eligible for special education under OHI. Father's Test., 773:9–12; Barber Test., 1610:14–21.

Instead, Katherine Barber proposed that A.F. be classified as eligible for special education under the emotional disturbance, or ED, category based on his depression and anxiety. R. at 1850–51. But Mother was concerned that this would not address A.F.'s executive functioning skills. R. at 1850. The District assured Mother that the services A.F. would receive would be based on his needs and not on his category of eligibility. R. at 1850–52; *see also* Grebouski Test., 1209:13–18; Barber Test., 1488:12–21 ("Needs drive goals and goals drive services."). *But see* Hr'g Tr., Test. of Gretchen Timmel,[24] 185:8–11 (concluding that "services that would be delivered to a student with [ED] would look very different" from services that A.F. needed), 207:17–19 ("[T]he diagnosis informs the services and how it manifests in the child.").

Ultimately, the District concluded that there was sufficient information to classify A.F. as being eligible under the ED category based on Dr. Grebouski's and

---

[23]     The criteria for a child to be considered to have autism for purposes of the IDEA, as defined in federal and state regulations, is not the same as the diagnostic criteria of the DSM-V. *Compare* 34 C.F.R. § 300.8(c)(1)(i) (requiring a significant effect on verbal and nonverbal communication and social interaction), *and* MUSER § VII(2)(A) (same), *with* R. at 421, 2306 (describing how DSM-V requires instead "the presence of persistent deficits in social communication and social interaction across multiple contexts"). *See Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1113 n.12 (9th Cir. 2016) (noting that the IDEA allows states "to define what qualifies as autistic for the purpose of special education").

[24]     Gretchen Timmel is an educational psychologist who evaluated A.F. in July 2019. R. at 496–98, 2029–31.

Dr. Jasinski's depression and anxiety diagnoses, and the team agreed to reconvene to write an IEP. R. at 562, 567–570, 1772, 1852–53, 1858–59, 1905–08; Camp Test., 919:22–920:18. In the meantime, A.F.'s 504 plan, as modified after the April 30 reentry meeting, was to remain in place. R. at 572–73, 1777–78.

On May 18, 2019, A.F. was admitted to St. Mary's hospital due to major depressive disorder, worsening anxiety, and suicidal ideation. R. at 3076–77, 3082. While at St. Mary's, A.F. was seen by a psychiatrist who questioned Dr. Jasinski's testing and conclusions and expressed doubts about A.F.'s autism spectrum disorder diagnosis. R. at 3083, 3096. This psychiatrist instead diagnosed A.F. with major depressive disorder and generalized anxiety disorder with features of obsessive-compulsive disorder. R. at 3094, 3101. A.F. remained hospitalized at St. Mary's until May 22. R. at 3076–77.

The IEP team reconvened on June 3, 2019—one week before the end of the school year—at which time the Parents made clear that they disagreed with the decision to code A.F. as having an ED. R. at 548–50, 1915–17, 2332. Instead, the Parents wanted him identified under the autism category. R. at 549, 1916, 1924. As with the previous IEP meeting, the District contended that it did not have sufficient information to make that designation and indicated that it was only prepared to offer an IEP under the ED category. R. at 1928–29.

The District again assured the Parents that A.F.'s executive functioning skill deficits could be addressed without an autism designation. R. at 1929, 1943. However, Mother remained concerned that A.F.'s issues with executive functioning and social

pragmatics would not be addressed under an ED designation, and she believed that his anxiety and depression were subordinate to the need to develop those skills. R. at 550–51, 1917–18, 1930. The Parents thus refused to consent to A.F. receiving special education services. R. at 1926–27.

At this point, nobody disputed A.F.'s eligibility for special education; rather, the dispute was as to his category of eligibility. Based on this dispute, development of an IEP was deferred pending further evaluation to determine A.F.'s eligibility category. R. at 549, 1916. In lieu of an IEP, A.F.'s 504 plan was continued in place with some slight modifications. R. at 549, 559–60, 1916, 1977–2014.

## IV.   Ninth Grade

On August 29, 2019, just prior to the start of A.F.'s first year at MHS, the IEP team reconvened and, for the first time, crafted an IEP. R. at 475–87, 2048–54, 2189–93. At this meeting, the IEP team agreed that A.F. qualified for an IEP under the "multiple disabilities" designation. R. at 478, 2192. Specifically, A.F. was deemed to be eligible under the following categories: OHI (due to his anxiety and ADHD), ED, and autism. R. at 478, 481, 2192, 2197.[25] However, the IEP team agreed that A.F. would be evaluated again to confirm or rule out his eligibility for special education under the autism category, and the Parents consented. R. at 476, 488–90, 2190, 2194–96; Barber Test., 1506:4–17.

---

[25]   Consensus as to the "multiple disabilities" classification was ultimately reached after the District proposed the "emotional disturbance" ("**ED**") identification, which the parents rejected in favor of "other health impaired" ("**OHI**"). R. at 478, 2192.

Despite the fact that A.F.'s eligibility category had not yet been precisely designated, the team crafted an IEP that was set to go into effect on the first day of school. R. at 476, 2190, 2333. The IEP continued most of the supports that A.F. was already receiving through his 504 plan, but it also provided A.F. with approximately eight and a half hours of special instruction per week to improve his organization and executive functioning skills, as well as a weekly meeting with a social worker. R. at 476, 483, 485–86, 2049, 2051–52, 2190.

### A.   Dr. Wisniewski's Report

On September 16,[26] and again on October 28, A.F. was evaluated by another psychologist, Dr. Kara Wisniewski. R. at 403, 2288. And on November 1, Dr. Wisniewski prepared her report, which the District provided to the Parents two days later. R. at 403, 2288, 2756. Dr. Wisniewski performed a battery of tests on A.F., including two autism-specific diagnostic tests. R. at 403, 2288. This testing demonstrated that A.F. exhibited many symptoms associated with autism spectrum disorder, and Dr. Wisniewski concluded that A.F. met the diagnostic criteria for autism spectrum disorder as identified by the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("**DSM-V**"). R. at 416–18, 421–23, 2301–03, 2306–08. Dr. Wisniewski also hypothesized that A.F.'s diminished interest in academics and his subsequent school refusal were likely the result of "social challenges associated with [autism spectrum disorder], in concert with comorbid anxiety, depression and

---

[26]     Dr. Wisniewski's report has a typographical error that says that A.F. was first interviewed on September 16, 2018, rather than 2019. R. at 403, 2288.

AD/HD." R. at 423, 2308. While Dr. Wisniewski was definitive in her conclusions, she later testified that autism spectrum disorder was not an obvious diagnosis in A.F.'s case. Hr'g Tr., Test. of Kara Wisniewski ("**Wisniewski Test.**"), 1392:3–5; *see also* R. at 1936 ("[H]e's one of those kids that kind of walk the line, he's one of those kids that can see . . . four doctors and two say yes and two say no.").

Given her findings and diagnoses, Dr. Wisniewski made five pages of detailed recommendations for how to support A.F. R. at 424–28, 2309–13. As relevant to the educational environment, Dr. Wisniewski recommended (often emphatically) that A.F. receive social skill instruction and support; assistance with his executive skills; "an executive system focus in any" of his activities, with coaching assistance from school personnel; a designated clinical point person at school; and, potentially, "alternatives to the school day including later start or earlier ending and programming in alternative settings." R. at 424–28, 2309–13.

## B.    A.F.'s Withdrawal from MHS and Enrollment in the Dover District

Despite Dr. Wisniewski's findings, an IEP was never implemented for A.F., because he stopped attending school in the District. He did not return after his first day of ninth grade on September 3, 2019, because he found MHS to be too loud and no one spoke to him much all day. R. at 2700, 2730. The Parents pulled A.F. out of school, and, in early November, they moved the family to Dover, New Hampshire, informing the District that A.F. no longer required an IEP from the District due to the move. R. at 415, 2300, 2730–31, 2761, 2767. The Dover District concluded that A.F. "require[d] a placement" at a private school "with a small teacher/student ratio

and [embedded] supports" and determined that placement at New England Academy was appropriate. Individualized Educ. Program, at 11–12 (ECF No. 11-2); Written Prior Notice of Special Educ. Program/Servs. (ECF No. 11-1).

## DISCUSSION

At oral argument, counsel for the Parents conceded that the District met its child find obligation once A.F. was identified as eligible for special education in May 2019. What I must now determine is when the District's child find obligation was triggered and whether the delay between the trigger date and determination of eligibility was reasonable. *See Spring Branch*, 961 F.3d at 793. While I conclude that the District had reason to suspect that A.F. was a child with a disability by the time of the November 2018 meeting, I further conclude that the six-month delay between this trigger date and the May 2019 determination of eligibility was reasonable.

## I.   Child Find Obligation Trigger Date

The child find obligation was triggered when the District had reason to suspect: (1) that A.F. had a qualifying disability; (2) that A.F. was in need of special education and related services; and (3) that A.F.'s disability caused the need for the special education services.

### A.   Qualifying Disability

In order to have a qualifying disability under the IDEA, the child's impairment must adversely affect his/her educational performance. That adverse effect need not be substantial or significant, but it must be more than a minor or transient hindrance and it must be based on objective evidence. The effect on the child's educational

40

performance is not limited to academic performance. It includes how a child functions and communicates, and it can also involve social and emotional performance. Thus, it is possible for a child to be adversely affected by a disability even though he continues to get good grades.[27]

It is undisputed that the District knew that A.F. had been diagnosed with ADHD and anxiety no later than September 2017, even before the limitations period in this case. In fact, by this point, the District already knew that A.F.'s psychiatrist, Dr. Gear, had recommended that A.F. receive a 504 plan or an IEP.[28] Even setting aside A.F.'s other diagnoses, ADHD can be considered a qualifying disability under the OHI category. *See* 34 C.F.R. § 300.8(c)(9); MUSER § VII(2)(J) ("Other health

---

[27]    The District and the DPHO repeatedly pointed to A.F.'s good grades as evidence of a lack of an adverse effect. Mother's Test. 100:10–101:5; Camp Test., 851:12–20, 896:22–897:1; R. at 77–78. But this ignored A.F.'s deficiencies in functional, social, and emotional areas. An inability to focus during classes later in the day has an adverse effect on a child's educational performance. Such a deficiency need not metastasize into poor academic performance to trigger a school district's child find obligation. *See* 34 C.F.R. § 300.111(c)(1); MUSER § IV(2)(A); *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 n.2 (2017) (declining to hold that a disabled child who is advancing from grade to grade is automatically considered to be receiving a FAPE); *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1082 (8th Cir. 2020) ("The District confuses intellect for an education."); *Mr. I.*, 480 F.3d at 22 ("Indeed, a child may 'do well in school' without special education, accumulating a high grade point average, but may nevertheless perform below acceptable levels in other areas, such as behavior."). The District's excessive focus on A.F.'s good grades erroneously narrows the universe of negative consequences that can constitute an adverse effect under Maine law.

[28]    The District argues that it had no reason to suspect that A.F. had a disability because his behavior was typical of a middle-school student. While some of the behavior that A.F. was exhibiting may have been typical of peers of his age—for instance, disorganization or a failure to turn in some assignments—by the fall of A.F.'s eighth-grade year, the District had information that distinguished A.F. from his classmates in at least two respects. First, the District knew that A.F. had been diagnosed with ADHD and that his psychiatrist had recommended a 504 plan or an IEP, which should have raised the question whether A.F.'s difficulties were normal developmental behaviors or whether they were attributable to his known disability. *See J.N. ex rel. M.N. v. Jefferson Cnty. Bd. of Educ.*, 421 F. Supp. 3d 1288, 1297 (N.D. Ala. 2019) (upholding due process hearing conclusion that school officials may not have attributed child's behavior to typical middle-school problems had they taken into account child's ADHD diagnosis). Second, I am skeptical that A.F.'s behaviors were as typical as the District contends. The District offers no evidence that a child picking at his hair and scalp or spending hours each day on the swings is a developmentally appropriate characteristic for middle school males.

41

impairment means having limited strength, vitality or alertness . . . that results in limited alertness with respect to the educational environment . . . that is due to . . . attention deficit hyperactivity disorder . . . and adversely affects the child's educational performance.").

Despite this earlier evidence that A.F. had a disability, it was not until June 2018—mere days before the end of A.F.'s seventh-grade year—that it became evident that A.F.'s disability was adversely impacting his education. The District knew, at that time, that A.F. was struggling to make it through a full day at school, was having difficulty completing tasks, and was coming home so fatigued and "checked out" that he would spend hours on the swings to try to regulate himself. It was because of this that the District concluded that A.F.'s ADHD and anxiety were substantially impairing his ability to concentrate at school and implemented a 504 plan.

By this point, given A.F.'s preexisting ADHD diagnosis and the now-apparent adverse effects on his educational performance, the District had reason to suspect that A.F. had a qualifying disability under the IDEA by the end of his seventh-grade year. But, because throughout most of his seventh-grade year A.F. was reported to be doing well, it was reasonable for the District to try to address these issues by implementing a 504 plan. *See Spring Branch*, 961 F.3d at 794; *D.K.*, 696 F.3d at 252; *Cape Elizabeth Sch. Dep't*, 382 F. Supp. 3d at 102–03. That is, the District did not yet have reason to suspect that A.F. was in need of special education services.

### B.    Need for Special Education Services and Causation

In the fall of 2018, however, the District began to have reason to suspect that A.F.'s known disabilities may have been causing a need for special education

services—the second and third prongs of the child find obligation trigger test. Within six weeks of entering eighth grade, it was apparent that A.F. was still having difficulty despite having a 504 plan. The Parents notified A.F.'s teachers that he was struggling to concentrate in his afternoon classes. Ms. Camp knew that A.F. was feeling overwhelmed with work and had missing assignments. Mr. Ryan noticed that A.F. was disorganized (particularly in comparison to the prior year). These concerns prompted another 504 meeting on October 24, 2018, during which it was discussed that multiple teachers noticed A.F.'s disorganization, haste, and fading focus in the afternoon. Mother also reported that A.F. had been picking at his hair and scalp and voiced her concerns about his executive functioning skills. The 504 team's primary innovation was to modify the 504 plan to include the expectation that A.F. would stay after school for help with his organization, which was asking a lot of a student who was struggling to concentrate as the day wore on.

Just before the 504 meeting on October 24, 2018, Mother emailed the District to request a neuropsychological evaluation to address A.F.'s executive functioning and his inability to fully access his education. The District treated the request as a referral to special education and got the process rolling to convene a meeting to assess A.F.'s eligibility for an IEP. Although the IEP referral completed in October of 2018 noted only one weakness in an academic area (rushing through material), it noted several behavioral or social/emotional weaknesses, including in the categories of: "Social problem solving," "Attention/Concentration," "Tendency to worry/fearful/

nervous," "Withdrawn/Social Isolation," "Planning/Organization," and "Self-Esteem." R. at 764–65, 1636–37.

In the intervening month between the October 504 meeting and the November IEP meeting, the inadequacies of the 504 plan became more apparent. Mother continued to raise concerns with Ms. Camp and with A.F.'s teachers about A.F.'s executive functioning skills and continued to relay her concerns about his struggles in the classroom. Mother also asked Ms. Camp about finding an outside executive skills coach for A.F. *Cf. Phyllene W. v. Huntsville City Bd. of Educ.*, 630 F. App'x 917, 925 (11th Cir. 2015) (holding that knowledge by board of education that mother was "actively seeking treatment" for child's hearing loss should have caused the board to have suspected a hearing impairment).

By the end of November of 2018, the District had reason to suspect that special education services—services that were ultimately recommended by Dr. Wisniewski a year later—may have been needed to address the deficits that had been identified. For example, the District should have suspected that A.F.'s known social skills issues, executive functioning deficits, and focus problems could have potentially benefited from social skill instruction, assistance in developing and practicing his executive functioning skills, and an altered school day.

The DPHO apparently agreed that by the time of the November 2018 meeting, the District had reason to suspect that A.F. was in need of special education services, since she concluded that "[t]he District was fully prepared to evaluate [A.F.] for special education" at that time. R. at 82. But the DPHO concluded that the District

did not move forward with the IEP evaluation—and was justified in not doing so—solely because Mother expressed resistance to special education. R. at 82–83.

Because, by the time of the November 2018 meeting, the District had reason to suspect that A.F. had a qualifying disability and that he needed special education because of that disability, I conclude that the District's child find obligation was triggered on November 28, 2018.

## II.    Unreasonable Delay

In the second part of the analysis, I focus on the reasonableness of the delay between the date that the child find obligation was triggered and the date that the child was identified as eligible for special education services. The parties agree that, had the November 2018 meeting triggered an IEP referral, an IEP evaluation and eligibility meeting would have been conducted by February 8, 2019, the end of the forty-five-school-day evaluation period outlined in Maine law. *See* MUSER § V(1)(A)(3)(a). And because I conclude that the November 2018 meeting was the trigger date for the District's child find obligation, I also conclude that the District had no obligation to implement an IEP prior to that February 8, 2019 deadline. The actual IEP eligibility meeting then occurred on May 9, 2019, at which time, the Plaintiffs concede, the District met its child find obligation. So, assuming that A.F. would have been identified as eligible for special education services by the IEP team on February 8, 2019, and assuming that the Parents would have been agreeable to having the District provide special education services through an IEP,[29] the decision

---

[29]    These are two pretty big assumptions for two reasons. First, Dr. Grebouski testified that he "thought that [the 504] plan was providing the supports" that A.F. needed and that "there was nothing

45

to evaluate A.F. under Section 504 resulted in a delay in identification of approximately ninety days. I must determine whether a ninety-day delay was reasonable in this case.[30]

The DPHO, in finding that the District was ready to evaluate A.F. for an IEP at the November 2018 meeting, blamed the Parents for the delay in identifying A.F. as eligible for special education. The DPHO found that the Parents made "a series of decisions throughout 8th grade that prevented the District from evaluating and identifying [A.F.] for special education." R. at 82. The first such decision that the DPHO identified was at the November 2018 meeting when, according to the DPHO, "Mother declared that she did not think [A.F.] needed special education services and did not want him to be evaluated for special education." R. at 82. The DPHO found that the Parents thwarted the District a second time when they removed A.F. from school and admitted him to AMITA. R. at 84. And, according to the DPHO, the Parents disrupted the process for a third time when they did not notify the District when they returned from AMITA. R. at 84.

---

that came out in [his] evaluation that would require [A.F.] to" have an IEP. Grebouski Test., 1166:23–1168:17. Second, as discussed below, Mother was initially reticent about having A.F. identified as a child with special needs. And, as became apparent at the June 3, 2019, IEP meeting, the Parents were particularly resistant to having A.F. identified under the ED eligibility category. It is not clear to me, had the IEP process proceeded, that the IEP team would have identified and implemented an IEP for A.F. by February 8, 2019.

[30]     The Plaintiffs correctly note that the IDEA does not specify a time limit between when the child find obligation is triggered and when an evaluation must occur. Pls.' Mem. of Law 35. And as I have explained, I conclude that this delay need only be reasonable. The Plaintiffs list various cases where delays in evaluation have been found to be unreasonable, but none involves a delay shorter than six months. Pls.' Mem. of Law 35 (citing cases).

The DPHO's order paints the Parents as trying to manipulate the system to secure a private school placement at the District's expense. *See* R. at 43–44, 84–85. I disagree with the DPHO's overall portrayal of the Parents and some of the interpretations of the evidence that resulted in the DPHO's jaded view of events. My reading of the record suggests that A.F. was struggling and rapidly deteriorating in 2019 and that the Parents were grappling with how to help A.F. and keep the rest of their family from collapsing. Through impressive determination, the Parents were able to get an accurate diagnosis despite skepticism from Dr. Grebouski and the doctor at St. Mary's. I do not see the Parents as manipulating the system. Rather, I see parents who were struggling against the odds to support their son. As I address in greater detail below, however, I do agree with the DPHO that the District cannot be faulted for much of the delay in the eligibility determination.

In assessing whether the ninety-day delay was reasonable, I focus on three things—first, the reasonableness of the initial determination to proceed with an evaluation pursuant to Section 504 rather than the IDEA, which all parties agree caused a delay in the eligibility determination; second, what the District knew about A.F.'s struggles after the November 2018 meeting and when it received this information, in order to determine whether the District had an obligation to speed the process along and prevent further delays; and third, whether portions of the delay were attributable to the Parents and not the fault of the District. Ultimately, I conclude that the District acted reasonably given the circumstances.

### A.  The Determination to Conduct the Evaluation under the 504 Plan

During the November 2018 meeting, Mother expressed that she did not think that A.F. needed special education services.[31] After Mother voiced concerns about A.F. receiving special education services,[32] Dr. Grebouski suggested that an evaluation could be performed under Section 504 rather than under the IDEA. The IEP team agreed to proceed using that approach with Mother signing a consent to have A.F. evaluated for "[p]sychological processing to explore executive functioning[,] social emotional functioning that impacts school engagement" and to "further assess [A.F.'s] diagnosed conditions of ADHD and anxiety." R. at 755, 1653.

The Plaintiffs argue that the District had the responsibility at the November 2018 meeting to ensure that Mother understood what special education services could be provided to A.F. and to inform Mother fully about the decision whether to agree to have A.F. evaluated pursuant to the IDEA. Pls.' Mem. of Law 31–32 (ECF No. 17). At the due process hearing, Mother testified that nobody at the November 2018 meeting explained to her the difference between a 504 plan and an IEP and that nobody told her that special education would have allowed A.F. to receive direct instruction in, and accommodations for, his executive functioning and social skills deficits. Mother's

---

[31]   I disagree partially with the DPHO's finding that "Mother clearly stated . . . that she did not think [A.F.] needed special education services and did not want him to be evaluated for special education." R. at 34. Although Mother expressed that she did not want A.F. to receive special education services, Mother clearly wanted an evaluation that would shed light on A.F.'s disabilities. No witness testified—and the minutes from the November IEP meeting do not say—that Mother ever expressly stated that she did not want A.F. *evaluated* for special education.

[32]   Dr. Grebouski was the only participant at the November 2018 meeting to shed any light on the reason for Mother's concerns. He testified that the Parents did not want A.F. identified as a student with special needs. Grebouski Test., 1140:10–17.

48

testimony was partially contradicted by Dr. Grebouski and Ms. Barber, who both testified that the differences between Section 504 and the IDEA were discussed. Ms. Barber also testified that she talked about the difference in timing between a 504 evaluation and an IDEA evaluation.

The DPHO credited Dr. Grebouski's and Ms. Barber's testimony, and the DPHO did not believe that Mother was unaware of the distinctions between the 504 and the IEP processes, or that Mother was unaware that special education services could include services that would help A.F.'s social and executive functioning deficits. R. at 82–83. The DPHO also based her conclusion on the fact that Mother was an engaged parent who held a master's degree in clinical mental health and who had experience with the IEP process through her daughter. R. at 83. The DPHO also mentioned that she found it hard to believe that Mother, who had been given a book about the difference between Section 504 and the IDEA by one of A.F.'s therapists, was not informed about the process. R. at 83. The DPHO had the benefit of hearing the evidence and assessing the demeanor of the witnesses. And the DPHO found that the evidence supported the conclusion that Mother was sufficiently knowledgeable about special education services and understood the differences between the Section 504 and the IDEA processes. Although I think the DPHO was unnecessarily hard on Mother, ultimately, most of her conclusions have record support. I also agree with the DPHO's conclusion that the District would have proceeded with an IDEA evaluation after the November 2018 meeting but for Mother's reluctance.

The core of the IDEA "is the cooperative process that it establishes between parents and schools." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). Parents play "a significant role in the IEP process," *id.*, and parental consent is required prior to the initiation of an IEP evaluation or prior to the administration of special education services, 20 U.S.C. § 1414(a)(1)(D). The involvement and consent of the Parents are thus important parts of the IEP process.

The Plaintiffs claim that the District should have conducted the IDEA evaluation or gotten Mother's signed refusal to evaluate under the IDEA.[33] But the District did get a signed consent to evaluate under Section 504, and the record shows no significant substantive difference between a 504 evaluation and an IDEA evaluation. Dr. Grebouski would have been the evaluator in either case, and the record does not show that he would have gathered materially different information, administered different tests, or come to different conclusions.[34] Although the IDEA

---

[33] The Plaintiffs point out that the IDEA treats consent to an evaluation separately from consent to special education services and argue that the District could have addressed Mother's reluctance about special education services after it completed an IDEA evaluation. Pls.' Mem. of Law 32–33. There are two edges to this sword. It seems to me that, if the 504 evaluation revealed that A.F. needed an IEP, the District could have addressed Mother's reluctance at *that* point, rather than forcing the issue of proceeding down the IDEA path in the face of Mother's hesitations.

[34] The regulations governing IEP evaluation procedures are relatively vague, but they are primarily concerned with ensuring that the scope of the evaluation be sufficiently broad to determine whether the child has a disability and, if so, what services should comprise the IEP. *See id.* § 300.304(b). When I asked at oral argument why Dr. Grebouski's evaluation was not adequate under the circumstances, counsel for the Plaintiffs gave me three reasons—(1) that Dr. Grebouski's evaluation happened too late, (2) that it did not include a classroom observation (which the Plaintiffs contend would be required as a part of an evaluation under the IDEA), and (3) that it did not examine all aspects of A.F.'s potential disabilities. The Plaintiffs' briefing provides two additional reasons why they believe Dr. Grebouski's evaluation was insufficient: (4) Dr. Grebouski's failure to conduct a clinical interview of A.F.'s parents or teachers and (5) the fact that he made no recommendations for A.F.'s program at school. Pls.' Mem. of Law 12.

First, as I explain above, I disagree that the District had an obligation to evaluate A.F. significantly sooner than February 2019.

and Section 504 are different, they are the same in many respects.[35] The fact that the

District chose a different path that led to the same destination in order to increase

---

Second, I fail to see how including a classroom observation in the evaluation would have made a meaningful difference. While I understand the Plaintiffs' argument that how A.F. behaved in class was important, Dr. Grebouski already had the benefit of hearing A.F.'s teachers' classroom observations through his attendance at the November 2018 meeting, and he also had Mr. Ryan fill out a questionnaire about A.F.'s behavior in class.

Third, I also disagree with the Plaintiffs' contention that Dr. Grebouski's evaluation did not examine all aspects of A.F.'s potential disabilities. At the time Dr. Grebouski's evaluation was conducted, nobody had yet suspected that A.F. had autism spectrum disorder. The District had reason to know that A.F. had ADHD and anxiety and that he had issues with his executive functioning and social skills. All of that was a part of Dr. Grebouski's testing mandate. At oral argument, counsel for the Plaintiffs pointed to Mother's October 2018 request for a neuropsychological evaluation to assess A.F.'s executive functioning deficits as a reason for why Dr. Grebouski's evaluation was inadequate. But the 504 team specifically requested that Dr. Grebouski assess A.F.'s executive functioning deficits, R. at 755, 1653, and Dr. Grebouski did just that. "The mere fact that a subsequent evaluation of [A.F.] yielded a different result" and determined that he had autism spectrum disorder "does not necessarily render [Dr. Grebouski's] earlier testing inadequate." *See D.K.*, 696 F.3d at 251. And as to the Plaintiffs' point that Mother requested a neuropsychological evaluation specifically, and that Dr. Grebouski was not a neuropsychologist, the record does not indicate that a neuropsychological evaluation is meaningfully different from a psychological evaluation. *See* Hr'g Tr., Test. of Kara Wisniewski ("**Wisniewski Test.**"), 1361:4–21; Grebouski Test., 1211:11–20. It also bears mention that the clinician who Mother requested perform a neuropsychological examination (Heather Blier) is a psychologist, not a neuropsychologist. R. at 998, 2475; Wisniewski Test., 1360:25–1361:3.

Fourth, while Dr. Grebouski did not conduct a "clinical interview" of A.F.'s parents or teachers, he did gather information from them. And the Plaintiffs do not identify any information that he was lacking by failing to do such an interview. And in any event, Dr. Grebouski testified that a "clinical interview" is only conducted with the patient. Grebouski Test., 1149:7–11.1219:18–23.

Fifth, although Dr. Grebouski did not make any recommendations in his report, he did testify that his recommendation would have been that an IEP was not necessary. Dr. Grebouski opined that nothing in his evaluation suggested the presence of autism or Asperger's syndrome. Had the IEP route been followed, the IEP team would have been discussing how to meet A.F.'s needs by February 8, 2019, but Dr. Grebouski may well have been recommending a continuation of the 504 plan rather than implementation of an IEP. *See* Grebouski Test., 1166:23–1168:17.

At best, the Plaintiffs identify various procedural errors made by the District. But procedural errors are not cognizable under the IDEA unless they have some sort of substantive effect. The Plaintiffs fail to identify any such substantive effect caused by these alleged procedural errors.

[35] The Plaintiffs contend that the District also violated Section 504. Pls.' Mem. of Law 24. These allegations are ultimately beside the point, since the Plaintiffs did not bring a cause of action pursuant to Section 504. And in any event, I have already explained why I disagree with the Plaintiffs' arguments that the 504 plan was inadequate. The District's incremental approach using the Section 504 process during A.F.'s seventh-grade year was reasonable. And I disagree that the District's duty to evaluate A.F. arose any earlier than November 2018, given the District's limited knowledge up to that point as to whether A.F. may have been in need of special education. It was reasonable for the District to see whether the 504 plan ameliorated the limited problems of which it was aware. For the same reason, I disagree with the Plaintiffs' contention that the District overly relied on general education interventions. *See* Pls.' Mem. of Law 26–29.

Mother's comfort level seems reasonable and in keeping with the IDEA's goal of a collaborative process that considers parental input. *Cf. Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) (finding that delay in eligibility determination was reasonable where school district spent interim period gathering information to help with eligibility determination).[36]

The primary difference between the 504 evaluation and an IDEA evaluation that I can discern from the record was the timing. Dr. Grebouski completed his report on February 28, 2019—twenty days after the February 8 deadline—so the decision not to conduct an IEP evaluation delayed the process by about three to four weeks.[37]

---

[36]   "[T]he IDEA imposes the Child Find obligation upon school districts, not the parents of disabled students," *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 677 (5th Cir. 2018), and the Plaintiffs contend that the District pushed this responsibility onto the Parents, Pls.' Mem. of Law 29–31. I view the circumstances here differently. Rather than seeing the District as putting the responsibility of triggering the child find obligation on Mother, I see the District as having acted to accommodate Mother's concerns about special education by proceeding down a substantially similar path via the 504 evaluation.

The Plaintiffs also contend that the District violated the IDEA both by failing to give written notice of its intention to proceed with an IDEA evaluation and its refusal to proceed with the IDEA evaluation. Pls.' Mem. of Law 32–33. It is not clear to me that such notice was required here where the nascent IDEA process was so quickly terminated in the face of Mother's reticence. Nevertheless, the District did provide prior notice of the IEP meeting, which states that the meeting was being called for the purpose of assessing "Initial referral/eligibility." R. at 1645–47. The Plaintiffs fail to explain what was lacking from this notice.

And I am skeptical that prior written notice was required prior to terminating the IDEA process. The statute says that written notice is required when the school district "refuses" to proceed with an evaluation. That is not what happened here. The District took measures to accommodate Mother's reasonable concerns and negotiated that they would proceed down a different path, a decision with which Mother agreed. I question whether such prior written notice was required here, or even how prior notice would work in such a situation. In any event, the District followed up with a written notice of what transpired at the November 2018 meeting by distributing the meeting minutes to the Parents. R. at 748, 1652, 1654. To the extent that the District violated its written notice obligations, these violations, too, would be procedural violations without any apparent substantive effect.

[37]   The February 8 deadline was for completion of the report and the convening of the meeting. Given that Dr. Grebouski's report was produced on February 28, 2019, and given the dramatic change in A.F.'s condition over the course of the month of February, I assume that the 504 team would have met promptly to consider Dr. Grebouski's results had Mother not taken A.F. to the AMITA Alexian Brothers Behavioral Health Hospital in Illinois. Even with the delay, the 504 team met to review Dr. Grebouski's report less than three weeks after he completed it.

To be sure, the delay came at a difficult time for A.F., whose emotional state spiraled downward in February of 2019. But given that the decision in November to proceed with a 504 evaluation was made when A.F. was not in crisis and that the decision was made because of Mother's hesitations and with her full agreement, I do not consider the three-to-four-week delay to have been caused by the District, nor do I consider it to be unreasonable.

### B.   What the District Knew About A.F.'s Continued Struggles

There is no doubt that A.F. continued to struggle at times between the November 2018 meeting and Dr. Grebouski's evaluation in February and that the District was aware of at least some of these struggles.[38] When Mother discussed her concerns with Ms. Barber, Ms. Barber suggested that the Parents wait to see what Dr. Grebouski's evaluation showed. And while Mr. Ryan and Ms. Camp were aware that A.F. was struggling, they, too, thought it prudent to find out the results of Dr. Grebouski's evaluation rather than to make another special education referral just yet.

I do not fault the District's desire to await Dr. Grebouski's results before taking further action. Even assuming a special education referral was required in December, January, or February, while Dr. Grebouski's evaluation remained pending, I do not

---

[38]   After the November 2018 meeting, Mother noticed that A.F. was not turning in his work and that his grades were slipping as a result, and she contacted his teachers to make sure they were aware of his struggles and to ask them to help. Mr. Ryan also noticed that A.F. was failing to turn in his assignments, as well as that he was increasingly tardy for class. Mother pulled A.F. out of school for a few days during this time period while adjusting his medication. After the holidays, A.F. briefly rallied but again began experiencing difficulties in January and into February. He complained of being tired, and mononucleosis was suspected but ruled out. A.F. also became more assertive about refusing to go to school, although Mother did not share this with the District.

see what purpose it would have served. While such a referral would have triggered another IEP meeting and, ultimately, an IDEA evaluation, I doubt whether such an evaluation would have been completed any faster than Dr. Grebouski's.[39] And, as I explained above, the record does not support the idea that such an evaluation would have produced different results than Dr. Grebouski's 504 evaluation. In short, the District had limited and inconsistent information about A.F.'s behavior between the November 2018 meeting and February 2019. And even if the District had seen cause to make another special education referral during this time period, I see no way in which it would have altered the course of events that had already been set in motion.

### C.   Delays Not Attributable to the District

Having decided that it was reasonable for the District to proceed with the 504 evaluation—regardless of the short delay that it caused in this case—and that it was reasonable for the District to continue on that route until the evaluation was completed, that leaves only the two-month delay between the distribution of Dr. Grebouski's report on March 1 and the May 9, 2019, IEP meeting. By the time Dr. Grebouski's report was released, A.F. had reached a crisis stage, and Mother drove A.F. to Illinois to admit him to the AMITA program. From there, A.F. did not return to Maine until the end of March. Even so, the District scheduled a 504 meeting to review Dr. Grebouski's findings within three weeks of the release of his report,

---

[39]    It may well have even been the case that Dr. Grebouski's pending 504 evaluation would have been converted into an IDEA evaluation.

accommodating the fact that Mother was in Illinois by having her call into the meeting.

At that meeting, Mother told the District for the first time that A.F. had been diagnosed with autism spectrum disorder. And immediately after the March 19, 2019, meeting, the District scheduled another IEP meeting for the second week of April. Father then asked to have this meeting rescheduled to accommodate a family vacation. And while the District offered to meet even earlier in April, Mother requested that the meeting not be held until Dr. Jasinski's evaluation was completed, which did not occur until late April. Mother provided Dr. Jasinski's report to the District on April 28, 2019, and an IEP meeting was held less than two weeks later.

While I do not necessarily disagree with the decisions that the Parents made during this time period (such as taking A.F. to AMITA), these decisions did have the collateral effect of delaying A.F.'s eligibility determination. And delays caused by the Parents are not attributable to the District. *See C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 286 (1st Cir. 2008). In my view, the District worked around A.F.'s AMITA hospitalization and the family's vacation as best it could in order to schedule the March 504 meeting and the May IEP meeting as promptly as possible under the circumstances.

Based on the above analysis, the delay between the District's child find obligation being triggered in November 2018 and the May 2019 IEP meeting was reasonable. The District sought to respect Mother's reticence to proceed down the IEP path; the District pursued a materially similar route by initiating the 504 evaluation;

and all of the delays during this time period were either caused by the Parents or were both sufficiently short and reasonably necessary in order to accommodate the competing considerations at play. In addition, the child find obligation is a procedural requirement, and violations of a procedural requirement of the IDEA must have a substantive effect. So, even assuming that some procedural violations occurred, the record does not support the contention that things would have played out materially differently had the District proceeded in a different manner.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Parents' request for relief.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 21st day of May, 2021.